UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Waylen Block, | Case No. 23-CV-0127 (JRT/JFD) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| United States of America, et al. | |
| Defendants. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and upon Defendants' Motion to Dismiss (Dkt. No. 53). For the reasons discussed below, the Court recommends that the motion be GRANTED IN PART and DENIED IN PART such that Plaintiff's claim under the Federal Tort Claims Act is allowed to proceed upon further amendment.

**I.    Background**

Plaintiff Waylen Block, a federal inmate at the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971); and the Federal Tort Claims Act against the United States and various officials and medical professionals at the Federal Correctional Institution in Sandstone, Minnesota ("FCI Sandstone"). (Dkt. Nos. 10, 73.)

1

A. **Factual Background**[1]

While at FCI Sandstone, Plaintiff was housed in a 120-square-foot space with four other adult inmates during a COVID-19 lockdown. (Dkt. No. 10 at 4.) He alleges that this housing setup constituted overcrowding and was inhumane as it placed a strain on his body, resulting in kidney issues. (*Id.*) Plaintiff contracted COVID-19 during this time. (*Id.*)

On February 21, 2021, Plaintiff was admitted to a local hospital for rhabdomyolysis and acute oliguric renal failure, which aggravated a disability of his eyes. (*Id.*) Plaintiff reports that his lungs filled with fluid and his legs swelled severely while in the hospital. (*Id.*) A catheter tube was inserted into Plaintiff's chest on February 22, 2021, for dialysis treatment and to remove fluid from his chest. (*Id.*) As a result, Plaintiff was unable to keep food down. (*Id.*)

Plaintiff returned to FCI Sandstone on February 22, 2021, after the evening meal had already been served. (*Id.* at 5.) According to Plaintiff, the staff was "unaware" of his arrival and his medical condition, but nonetheless denied him food, medication, and medical supplies. (*Id.*) Plaintiff received a non-renal breakfast the next morning, but was unable to eat it without his medication, resulting in his first meal being at lunchtime when he received his medication. (*Id.*) The staff at FCI Sandstone was unable to care for Plaintiff's medical condition and, instead, placed him in the Special Housing Unit with a

---

[1] For purposes of Defendants' motion to dismiss, the Court takes all facts alleged in Plaintiff's Consolidated Complaint as true. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555–56 (2007); *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010). Accordingly, the following relevant allegations are taken from the Consolidated Complaint.

2

thin mattress. (*Id.*) Plaintiff was also denied treatment for his eye condition because the staff was focusing on treating his kidney condition. (*Id.*)

Plaintiff left FCI Sandstone three times a week for dialysis at a medical provider in the community and was placed in "black box" restraints during each trip.[2] (*Id.*) The restraints remained on during his dialysis treatment. (*Id.*) Defendant White, an officer at FCI Sandstone, accompanied him on most of these trips and appeared to act as the lead officer, with other officers following Defendant White's standards. (*Id.*) Plaintiff alleges that the "black box" restraints placed his wrists in a very uncomfortable position during his treatment, causing his blood pressure to elevate and triggering the heart rate monitor's alarm. (*Id.*) Plaintiff also experienced severe headaches and nausea and sometimes received injections to stop vomiting. (*Id.*) He notes that Defendant White held a garbage can for him once while he vomited during dialysis treatment. (*Id.*)

Plaintiff made several requests for the restraints to be removed during treatment, but Defendant White told him the restraints had to remain on due to orders from FCI Sandstone's captain. (*Id.*) Plaintiff asked his medical provider for assistance in having the restraints removed, who informed him that she had inquired about the matter with the captain, who again denied the request and ordered that Plaintiff remain in restraints. (*Id.*)

---

[2] *See generally Davis v. Peters*, 566 F. Supp. 2d 790, 798 (N.D. Ill. 2008) ("The black box is a rectangular device measuring approximately four inches by three inches. When placed over the chain of a pair of handcuffs, it both limits a prisoner's ability to move his hands, and prevents access to the handcuffs' keyholes.").

Accordingly, Plaintiff remained in restraints for each dialysis treatment, except for one session shortly before his transfer from FCI Sandstone. (*Id.*) Correctional Officers John Doe and Jane Doe removed his restraints for that dialysis session. (*Id.* at 5–6.)

Plaintiff was transferred to FMC Devens at the end of March 2021. (*Id.* at 6.) There, he reported worsening visual distortion in his right eye, which required prompt treatment. (*Id.*) It took several months for him to receive the necessary care. (*Id.*)

Due to the heart catheter, Plaintiff was directed to avoid showering and instead to use a sponge bath. (*Id.*) Without any supplies, he had to use a garbage can and cloth to clean himself for the three weeks of quarantine. (*Id.*) Despite many sick call slips from Plaintiff and his family, the medical team at FMC Devens did not change the bandages on his catheter. (*Id.*) Once in the general population unit, Plaintiff was taken off dialysis and had his catheter removed without a consultation with his doctor. (*Id.*)

While at FMC Devens, Plaintiff missed a payment by one hour for his Financial Responsibility Program ("FRP") and was consequently placed on a six-month commissary restriction. (*Id.*) His request to renegotiate the FRP contract was initially denied by the Case Manager, who responded dismissively. (*Id.*) Eventually, the Unit Manager arranged a new contract at a new monthly payment of $100, instead of $25 as it was before. (*Id.*)

Despite being scheduled for intravitreal injections to treat his vision-threatening condition, Plaintiff's appointments were frequently delayed. (*Id.* at 7.) The first injection was on July 15, 2021, with subsequent appointments significantly delayed, causing irreversible damage to his vision. (*Id.*) Several emails from Plaintiff's family to the medical department highlighting the urgency of timely treatment were ignored. (*Id.*)

On February 11, 2022, Plaintiff filed five written Administrative Remedy Requests ("BP-9's") against FCI Sandstone, 28 C.F.R. § 542.14. (*Id.*) The next day, he was placed in the Special Housing Unit, then, the very next day, was transferred to the Metropolitan Detention Center Brooklyn ("MDC Brooklyn") in New York City. (*Id.*) At MDC Brooklyn, Plaintiff again informed medical staff about his need for ongoing eye treatment, but necessary care was still delayed. (*Id.*) An ophthalmologist appointment was canceled due to a scheduling error by Bureau of Prisons ("BOP") staff. (*Id.* at 8.) Medical staff eventually recommended a return to the previous facility for continued treatment, but this process was delayed, worsening Plaintiff's vision condition. (*Id.*)

After further transfers and continued delays, Plaintiff went without prescribed treatment from February 14 to July 8, 2022, causing irreversible damage. (*Id.* at 8–9.) He developed additional health issues, including Type III kidney disease, hypertension, blindness in the right eye, and post-traumatic stress disorder ("PTSD") due to the prolonged pain and suffering. (*Id.*)

### B. Procedural Background

On January 17, 2023, Plaintiff filed suit in this Court, pursuant to 42 U.S.C. § 1983, for alleged violations of his civil rights, including his Eighth Amendment rights against cruel and unusual punishment and Fourteenth Amendment rights to due process. (Dkt. No. 1.) The complaint also included a brief reference to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). Plaintiff named as defendants various officials and medical professionals at FCI Sandstone in their individual and official capacities.

On April 3, 2023, with leave of Court, Plaintiff filed an Amended Complaint. (Dkt. No. 10.) On September 18, 2023, Plaintiff filed a new suit, Case No. 23-CV-2873, in which he advanced essentially identical factual allegations, but premised his suit upon the Federal Tort Claims Act instead of Section 1983 and *Bivens*. (Dkt. No. 73.) Plaintiff brought this new suit against the United States as the sole defendant. On the same day, Plaintiff moved the Court for consolidation of these cases. (Dkt. No. 45.)

While the motion for consolidation was pending, Defendants filed a motion to dismiss Plaintiff's Amended Complaint on November 13, 2023. (Dkt. No. 53.) Shortly thereafter, the Court granted Plaintiff's motion to consolidate, treating the two matters as consolidated into one and combining the allegations in the two lawsuits by adding the cause of action under the Federal Tort Claims Act (as alleged in Plaintiff's second action, which was virtually identical to plaintiff's first action) to the Amended Complaint. This combined complaint will be referred to as "the Consolidated Complaint." (Dkt. No. 72.) The Court ordered Defendants to file a supplemental brief on their motion to dismiss. (*Id.*) Defendants did so, and Plaintiff filed a timely response. (Dkt. Nos. 74, 77.)

Effectively, Defendants have moved to dismiss all of Plaintiff's claims—both constitutional and statutory—for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).

**II.   Standard of Review**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "the factual allegations in a complaint, assumed true, must suffice to state a claim to relief that is plausible on its face." *Carton v. Gen. Motor Acceptance Corp.*, 611

6

F.3d 451, 454 (8th Cir. 2010). In addition to accepting all of the factual allegations in the complaint as true for purposes of Defendants' motion to dismiss, the Court draws all reasonable inferences in Plaintiff's favor, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 45; *see Riley v. St. Louis Cnty.*, 153 F.3d 627, 629 (8th Cir. 1998); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. When courts undertake the "context-specific task" of determining whether a plaintiff's allegations "nudge" its claims against a defendant "across the line from conceivable to plausible," they may disregard legal conclusions that are couched as factual allegations. *See id.* at 678–81. Likewise, the Court need not accept as true wholly conclusory allegations couched as facts. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 840 (8th Cir. 2004).

While the Court is required to construe the content within Plaintiff's pleadings liberally because he is proceeding *pro se*, Plaintiff is nevertheless bound by applicable procedural and substantive law. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) ("Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law."). Thus, Plaintiff's Consolidated Complaint "still must allege sufficient facts to support the claims advanced." *Stone*, 364 F.3d at 914; *see, e.g.*, *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989) (regarding a *pro se* plaintiff, "we will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts

that have not been pleaded"); *Cunningham v. Ray*, 648 F.2d 1185, 1186 (8th Cir. 1981) ("[P]ro se litigants must set [a claim] forth in a manner which, taking the pleaded facts as true, states a claim as a matter of law.").

### III. Analysis

#### A. Plaintiff's Constitutional Claims

At the outset, the Court notes that Plaintiff's Consolidated Complaint and memorandum in opposition to Defendants' Motion to Dismiss primarily cite 42 U.S.C. § 1983 in support of his constitutional claims. But this statute does not allow suits against *federal* defendants acting under claim of federal authority. *See Jones v. United States*, 16 F.3d 979, 981 (8th Cir. 1994) ("The statute simply provides a means through which a claimant may seek a remedy in federal court for a constitutional tort when one is aggrieved by the act of a person acting under color of state law."); *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) ("An action under *Bivens* is almost identical to an action under section 1983, except that the former is maintained against federal officials while the latter is against state officials."). Because Plaintiff's Consolidated Complaint also references *Bivens*, the Court considers his causes of action as *Bivens* claims. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("*pro se* document is to be liberally construed").

A *Bivens* claim allows a plaintiff to bring an action for monetary damages against *federal* agents acting under the color of their authority for injuries caused by their unconstitutional conduct. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001). "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Id.*

8

In *Bivens*, the Supreme Court recognized an implied cause of action under the Fourth Amendment claim against Bureau of Narcotics agents who handcuffed a man in his own home without a warrant. 403 U.S. at 389, 397. The Supreme Court has only recognized a *Bivens* remedy in two other contexts: a Fifth Amendment gender discrimination claim against a Congressman for firing his female staffer, *Davis v. Passman*, 442 U.S. 228, 248–49 (1979), and an Eighth Amendment claim against prison officials for failure to treat an inmate's asthma, *Carlson v. Green*, 446 U.S. 14, 24 (1980). *See Ziglar v. Abbasi*, 582 U.S. 120 (2017) (recognizing that "[t]hese three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself").

A *Bivens* remedy is not available for all constitutional violations and expanding the implied cause of action under *Bivens* is "a 'disfavored' judicial activity." *Id.* at 1857 (citing *Iqbal*, 556 U.S. at 672). The Eighth Circuit Court of Appeals has adopted a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials." *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2019) (quoting *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005)).

Courts undertake a two-step analysis to determine if an implied cause of action under *Bivens* exists. *Farah v. Weyker*, 926 F.3d 492, 498 (8th Cir. 2019). The first step is to ascertain whether the case presents "one of 'the three *Bivens* claims the [Supreme Court] has approved in the past' or whether, instead, allowing the plaintiffs to sue would require us to extend *Bivens* to a new 'context.'" *Id.* If the claim presented is not one that has been previously recognized, courts consider whether "special factors counsel[] hesitation" in

9

extending *Bivens* to the claims at hand. *Id.* A case may be meaningfully different because of:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, U.S. 120 at 139–40.

Here, Defendants argue that the facts of this case present claims that are not cognizable under *Bivens* because they arise in a new context. Defendants also argue that special factors counsel against recognizing the claims that are advanced here. (Dkt. No. 55 at 15–27.) The Court agrees.

Plaintiff's Consolidated Complaint alleges that Defendants violated his Eighth Amendment rights against cruel and unusual punishment and Fourteenth Amendment rights to due process by: (1) quintuple-celling Plaintiff, (2) failing to follow CDC guidelines relating to COVID-19, (3) placing Plaintiff in the Special Housing Unit, and (4) keeping Plaintiff in "black box" restraints during medical procedures. (Dkt. No. 10 at 10–11.) These are different circumstances than those presented in *Carlson*, where the Eighth Amendment claim centered on grossly inadequate medical care provided to an inmate during a severe asthma attack. 446 U.S. at 16 n.1. Plaintiff's Eighth Amendment and Fourteenth Amendment claims—while relating to medical care—center on the conditions of his *previous* confinement, which, he complains, posed some serious health risks. *Id.* Plaintiff's claims thus assert a different "mechanism of injury" (conditions of confinement

as opposed to deliberate indifference to medical needs) and present a new context under the Supreme Court's precedents. *See, e.g.*, *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021) (holding that Eighth Amendment claim based on conditions of "confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing" bore little resemblance to the facts in *Carlson*); *Schwarz v. Meinberg*, 761 F. App'x 732 (9th Cir. 2019) (holding that Eighth Amendment claim based on unsanitary cell conditions presented a new context).

Because Plaintiff's Eighth Amendment and Fourteenth Amendment claims arise in a new context, the next question is whether there are "special factors" indicating "that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'" and thus further preventing the Court from recognizing a *Bivens* remedy. *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). The Supreme Court has cautioned: "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020)). Moreover, where there are "alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Id.* at 493 (quoting *Ziglar*, 582 U.S. at 137). It does not matter if those existing remedial structures "do not provide complete relief" or are "not as effective as an individual damages remedy." *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 372 (1983)).

Special factors counsel hesitation in expanding *Bivens* to capture Plaintiff's allegations regarding the conditions of his previous confinement at FCI Sandstone. Again,

11

"legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Ziglar*, 582 U.S. at 148. In this case, Defendants point to two remedial structures that they argue preclude this Court from recognizing a *Bivens* remedy for Plaintiff: (i) the BOP's Administrative Remedy Program and (ii) the Prison Litigation Reform Act. Plaintiff does not argue that he did not have these remedial structures available to him; to the contrary, he admits that he availed himself of at least the former. (Dkt. No. 10 at 3; *see* Dkt. No. 1, Ex. B.)

The availability of these alternative remedial schemes thus counsels against expansion of the *Bivens* remedy in this case. As the Court explained in *Ziglar*:

> Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. . . . [T]he Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Ziglar*, 582 U.S. at 148–49. Moreover, the Federal Tort Claims Act is another alternative venue for Plaintiff's claims, *see Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) (citing 28 U.S.C. § 2680(h))—which he pursues here and to which the Court turns next.

For the foregoing reasons, Plaintiff's constitutional claims pursuant to *Bivens* should be dismissed.

### B. Plaintiff's Statutory Claim

The Federal Tort Claims Act ("FTCA") provides a limited waiver of sovereign immunity for tort actions against the United States or its agencies. 28 U.S.C. §§ 1346(b).

12

Under the FTCA, a party may maintain an action against the United States in federal court for monetary damages arising from "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." *Id.* § 1346(b).

The United States is the only proper defendant in an action asserting an FTCA claim. *See, e.g.*, *Knowles v. United States*, 91 F.3d 1147, 1150 (8th Cir. 1996); *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998). Plaintiff correctly named only the United States as the defendant on his complaint in the second lawsuit, alleging a FTCA claim.

To bring an actionable FTCA claim, however, a plaintiff must show that he has previously exhausted his FTCA administrative remedies. *See* 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing."). The Eighth Circuit has held the "[p]resentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant." *Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir. 1993).

Here, Plaintiff pleads that he exhausted his FTCA claim administratively. (Dkt. No. 10 at 5; Dkt. No. 1, Ex. B.) Defendants do not dispute this. (*See also* Dkt. No. 74 at 3 (acknowledging that "the BOP received an administrative claim form from [Plaintiff] seeking $30 million . . . with numbered paragraphs that describe some of the same alleged facts included in the [Consolidated Complaint]").) Indeed, the record demonstrates that the BOP received Plaintiff's FTCA claim seeking damages for "[t]ype III [k]idney disease ,

13

COVID-19, [b]lind in right eye, excessive [f]orce and [t]orture" on December 20, 2022, but failed to act on it. (Dkt. No. 73-1 at 1; Dkt. No. 75 at 3.) Accordingly, the Court considers Plaintiff's FTCA claim as fully exhausted as to the injuries listed there. *See* 28 U.S.C. § 2675(a) ("The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.").

Under the FTCA, the "United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, for a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," *id.* § 1346(b)(1). *Tracor/MBA, Inc. v. United States*, 933 F.2d 663, 665 (8th Cir. 1991) ("The government is not liable, however, for any claim based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" (Cleaned up.)). FTCA claims are subject to, and governed by, the substantive law of the state in which the claim arose. 28 U.S.C. § 1346(b)(1).

The sole argument of the United States here is that Plaintiff's Consolidated Complaint "is best understood as sounding in medical malpractice" and, as such, it should be dismissed for failure to include the required expert affidavit under Minnesota law. (Dkt. No. 74 at 4–6 (citing Minn. Stat. § 145.682).) Plaintiff did not respond to this argument. (*See* Dkt. No. 77.) In any event, the Court does not take the same view as the United States, because that view fails to account for any of the facts occurring *after* Plaintiff's transfer

14

from FCI Sandstone. (*See* Dkt. No. 55 at 4 (noting simply that "the remaining factual allegations of the Amended Complaint relate to events occurring after [Plaintiff] left FCI Sandstone, and do not appear to relate to any of the individually-named Defendants in this case"); Dkt. No. 74 at 2 (discussing only allegations "pertinent to his time at FCI Sandstone").) Given that the allegations involve BOP officials in at least two other locations—namely, FMC Devens and MDC Brooklyn—it is unlikely that only Minnesota causes of action are plausible here.

Liberally construing Plaintiff's allegations, *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014), the Court finds that Plaintiff has potentially alleged violations of state law based on claims of negligence—which is sufficient to allow his FTCA claim to proceed. *See, e.g.*, *Holthusen v. United States*, 498 F. Supp. 2d 1236, 1243–44 (D. Minn. 2007) (duty of care under Minnesota law). However, instead of combing through tort law from the various jurisdictions to determine whether Plaintiff has stated an actionable FTCA claim—a task neither Plaintiff nor Defendants have undertaken—the Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's FTCA claim and leave be granted to allow Plaintiff an opportunity to amend his claim and make clear the basis on which he wishes to bring it.

Moreover, given the complexity of the legal issues here, the parties and the Court would benefit from having Plaintiff discuss the matter with counsel. Accordingly, if this

Report and Recommendation is adopted by the District Judge, the undersigned will refer Plaintiff to the *Pro Se* Project[3] for possible consultation with a volunteer attorney.

## IV. Recommendation

Accordingly, based on the foregoing and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendants' Motion to Dismiss (Dkt. No. 53) be **GRANTED IN PART** and **DENIED IN PART** as outlined in this Record and Recommendation; and

2. Plaintiff's Causes of Action under 42 U.S.C. § 1983 and *Bivens v. v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), be **DISMISSED WITHOUT PREJUDICE**.

Date: July 9, 2024         *s/   John F. Docherty*
                           JOHN F. DOCHERTY
                           United States Magistrate Judge

### NOTICE

**Filing Objections**: This Report and Recommendation is not an order or judgment of the District Court and therefore is not appealable directly to the Eighth Circuit Court of Appeals. Pursuant to District of Minnesota Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report and Recommendation within 14 days. A party may respond to objections within 14 days of being served a copy. All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

---

[3] The *Pro Se* Project is a collaboration between the United States District Court for the District of Minnesota and the Minnesota Chapter of the Federal Bar Association, through which volunteer lawyers donate their time to assist unrepresented individuals.